**CULTOR CORPORATION and Cultor Food Science, Inc.,** Plaintiffs–Appellants,

v.

**A.E. STALEY MANUFACTURING COMPANY, Defendant–Appellee.**

No. 99–1232.

United States Court of Appeals, Federal Circuit.

Sept. 21, 2000

Rehearing and Rehearing En Banc Denied Nov. 3, 2000

Kelly L. Morron, Brobeck, Phleger, & Harrison, LLP, of New York, New York, argued for plaintiffs-appellants. With her on the brief were James J. Elacqua, Beth D. Jacob, and Robert G. Kramer.

Salem M. Katsh, Shearman & Sterling, of New York, New York, argued for defendant-appellee. With him on the brief were James R. Warnot, Jr. and Antoinette E. Baker.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

Cultor Corporation and Cultor Food Science, Inc. (together, "Cultor") appeal the decisions of the United States District Court for the Southern District of New York[1] granting summary judgment that the A.E. Staley Mfg. Co. ("Staley") does not infringe the asserted claims of either of United States patents Nos. 5,667,593 ("the '593 patent") and 5,645,647 ("the '647 patent") and denying leave to amend the complaint. We affirm the decisions of the district court.

### Background

The '593 and '647 patents, both of which are entitled "Modified Polydextrose and Process Therefor," are directed to "an improved, water-soluble polydextrose containing 0.3 mol % or less of bound citric acid, a process therefor, and foods containing same." Polydextrose is a low-calorie replacement for flour and sugar that is often used to replace some of the bulk that is lost when artificial sweeteners are substituted for sugar in cakes or like products. Staley manufactures polydextrose and sells it with the brand name "Sta–Lite III."

Commercial manufacture of edible polydextrose originated with a process developed by Hans H. Rennhard. The Rennhard process includes the step of heating dextrose in the presence of a catalytic amount of citric acid. The polydextrose thereby produced has a slightly bitter taste. Donald Guzek *et al.*, the inventors of the '539 and '647 patents, discovered that the bitter taste could be remedied by

---

1. *Cultor Corp v. A.E. Staley Mfg. Co.*, No. 98–CV–1199, 1998 WL 744029 (S.D.N.Y. Oct. 26, 1998 & Nov. 17, 1998, 1998 WL 796471).

passing the final polydextrose, in aqueous solution, through an ion-exchange resin. The patents at issue are directed to this process. The claims in suit of the '593 patent follow:

24. A polydextrose composition substantially free of bitter-tasting residual compounds made by the process consisting essentially of:

a) dissolving polydextrose in water;

b) passing said solution through an ion-exchange column; and

c) collecting and concentrating the eluate produced thereby until a commercially useful polydextrose composition is recovered.

32. A polydextrose bulking agent useful for incorporation in reduced calorie foods, substantially free of bitter-tasting compounds.

33. The polydextrose composition according to claim 32 wherein said bitter-tasting compounds are acidic.

Claim 24 of the '647 patent is also in suit:

24. A method for the purification of polydextrose consisting essentially of:

a) dissolving polydextrose in water;

b) passing said solution through an ion exchange column; and

c) collecting and concentrating the eluate produced thereby until a substantially functional product is recovered.

The specifications of the patents explain that the bitter taste is due to the use of citric acid in the Rennhard process, and that some citric acid remains bound to the product. The ion-exchange procedure removes this bound acid.

The process by which Staley makes its polydextrose also includes the step of heating polydextrose in the presence of an acid catalyst, and Staley also passes its final polydextrose through an ion-exchange resin. However, Staley uses phosphoric acid instead of the citric acid of the Rennhard process. Cultor sued Staley for infringement of the Guzek patents, charging that the claims literally read on the Staley process and product. Staley responds that the claims must be interpreted as limited to polydextrose produced using citric acid, pointing to the following description in the patent specifications:

As used herein, the expression "water-soluble polydextrose" (also known as polyglucose or poly-D-glucose) specifically refers to the water-soluble polydextrose prepared by melting and heating dextrose (also known as glucose or D-glucose), preferably with about 5–15% by weight of sorbitol present, in the presence of a catalytic amount (about 0.5 to 3.0 mol %) of citric acid.

'593 patent, col. 1, lines 24–30. The district court agreed with Staley and granted summary judgment of non-infringement, ruling that the definition of "water-soluble polydextrose" in the specification limited the claims to polydextrose produced with citric acid as a catalyst.

Cultor also asserted infringement under the doctrine of equivalents, arguing that even if the claims are deemed limited to the specification's definition of polydextrose prepared using a citric acid catalyst, citric and phosphoric acid are interchangeable in the Rennhard polydextrose process, and both are removed by the ion-exchange treatment.

The district court, reviewing the prosecution histories of the patents in suit, found that the inventors had repeatedly distinguished their invention from the prior art by emphasizing their discovery that citric acid caused the bitterness in polydextrose produced by the Rennhard process and that such bitterness could be removed by removing the residual citric acid by means of an ion-exchange resin. The court concluded that to permit Cultor's claims the scope now requested would ensnare the prior art and permit Cultor to patent an "invention" which was no more than "a desirable result." Cultor challenges these conclusions, stating that its claims are not limited to any particular acid, and that the claims define the patented invention. Cultor also states that in all events, phosphoric and citric acid are equivalent catalysts for this process, and

the ion exchange procedure removes either bound acid.

### Literal Infringement

■ Cultor argues that the Rennhard process is not limited to a citric acid catalyst and points out that the original Rennhard patent (now expired) lists ten possible acid catalysts. However, the Guzek patents do not define their polydextrose purification process in terms of any acid catalyst, but only in terms of a citric acid catalyst. By explicitly limiting the subject matter to that produced using a citric acid catalyst, the inventors limited their claimed invention. The district court applied the inventors' own definition of the term "water-soluble polydextrose" as a limitation to the claims.

■ Whether a claim must, in any particular case, be limited to the specific embodiment presented in the specification, depends in each case on the specificity of the description of the invention and on the prosecution history. These sources are evaluated as they would be understood by persons in the field of the invention.

The Guzek patents describe an improvement of the Rennhard process, explaining the problem that they discovered was caused by the use of citric acid as the catalyst. Guzek teaches how to solve the problem by a specific method of removing the citric acid. The inventors described their invention narrowly and with specificity. Staley states that its phosphoric acid does not produce a bitter taste and raise the same problem solved by Guzek, but that the phosphoric residue must be removed to meet purity standards set by the Food and Drug Administration. Staley argues that ion-exchange is a conventional method of removing phosphoric acid, and that if the Guzek claims were to be interpreted to encompass this conventional usage, they would be invalid as embracing the prior art. The district court agreed.

■ We discern no error in the district court's construction of the claims as including the definition of "water-soluble polydextrose" in the specification. Having explicitly defined this term as limited to that prepared with a citric acid catalyst, this effected a disclaimer of the other prior art acids. Claims are not correctly construed to cover what was expressly disclaimed. Thus we affirm the district court's summary judgment that there is not literal infringement.

### The Doctrine of Equivalents

■ Cultor argues that even if no literal infringement is found, the Staley process and product infringe under the doctrine of equivalents. Cultor states that there is no prosecution history estoppel because none of the asserted claims was amended to avoid prior art and the inventors never argued a distinction on the basis of citric acid, citing *Warner–Jenkinson Co. v. Hilton Davis Chemical Company*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 U.S.P.Q.2d 1865 (1997). Cultor also takes issue with the district court's characterization of its proposed construction of claim 32 as an attempt to patent "a desirable result."

Staley responds that the absence of amendment and argument arises because the claims in suit were copied for interference purposes. However, this special case should not generate an irrational result. The purpose of the invention is the removal of bitter taste caused by citric acid. To enlarge the scope to cover other acids, when no bitter taste and no citric acid are present, by use of a well known purification mechanism, is not available through the doctrine of equivalents. We do not discern clear error in the district court's conclusion that "plaintiffs, who patented a process to remove bitter tasting citric acid esters from Rennhard's polydextrose, may not assert a claim of patent infringement against the defendant, who has manufactured polydextrose using a different process, simply because the resulting product also tastes great because it is free from bitter tasting compounds." The court's finding of no infringement under the doctrine of equivalents is affirmed.

### The Interference

Cultor states that the claims it is asserting against Staley were obtained in an interference contest, and that the claims should be given the same broad interpretation they received in the interference.

The claims were copied by Cultor from United States Patent No. 5,091,015, a patent assigned to the Warner–Lambert Co. The PTO declared the interference, which was later settled. Since the claims were copied to provoke an interference, Cultor argues that they should be construed as they would be construed in the patent from which they were copied. Cultor cites *In re Spina*, 975 F.2d 854, 858, 24 U.S.P.Q.2d 1142, 1145 (Fed.Cir.1992), in which this court stated: "A claim is not interpreted one way in light of the specification in which it originally was granted, and another way in light of the specification into which it is copied as a proposed interference count." Thus, argues Cultor, the term "polydextrose" should be interpreted according to the use of that term in the Warner–Lambert patent.

The Warner–Lambert patent claims were not limited to polydextrose produced by using citric acid as a catalyst, although that patent described the Rennhard process and used a citric acid catalyst. Cultor argues that "polydextrose" in its ordinary meaning, to persons of skill in the art, is not encumbered by the nature of the catalyst, and thus is not limited, in the Warner–Lambert specification, to the specific acid catalyst actually used in its production.

Every patent claim is construed in the context of the specification in which it appears as part of the patent document. When a claim is copied from another patent for interference purposes, it must be supported by the specification of the copier. In *Spina* the application into which the claim was copied was deemed to contain sufficient written description to support the claim, although the structure by which the claimed function was performed was not the same as the structure shown in the specification from which the claim was copied. The court in *Spina* did not hold that the copier of a claim for interference purposes thereby acquires the benefit of the descriptive text of the copied patent.

The claims to which Cultor demonstrated priority in the interference are construed in light of Cultor's specification; it becomes irrelevant whether the specific text of the claim was copied from the interfering patent. *See Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1143, 42 U.S.P.Q.2d 1589, 1594 (Fed.Cir.1997) ("The specification that is relevant to claim construction is the specification of the patent in which the claims reside.")

### The Motion to Amend the Complaint

After summary judgment of noninfringement was granted as to the four asserted claims, Cultor moved to amend its complaint to assert other claims of the '593 and '647 patents. The district court denied the motion without comment. Cultor appeals this denial, arguing that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the Second Circuit, whose law we apply in issues not unique to this court's jurisdiction, the decision to grant or deny leave to amend (when such amendment is not a matter of right) is reviewed on the standard of abuse of discretion. *Zahra v. Town of Southold*, 48 F.3d 674, 686 (2d Cir.1995).

Cultor provides no explanation of how it could prevail on other claims in light of the district court's claim construction, which applies to all the claims. Instead, Cultor argues that the district court should have explained its decision, citing *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), wherein the Court stated:

> In the absence of any apparent or declared reason—such as ... futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of

an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.* at 182, 83 S.Ct. 227. Cultor argues that this requires, at a minimum, an explanation by the district court of its reasons for denying the motion to amend.

■ Ordinarily, courts of appeals frown on unexplained exercises of discretion by trial judges. Sometimes, however, the explanation is apparent. *See id.* Since every claim in the '647 and '593 patents is directed to polydextrose or a process for manufacturing or purifying it, any claim that Cultor might assert by amended complaint is limited, by the district court's claim construction, to Cultor's definition requiring use of a citric acid catalyst. The district court has determined, and we have affirmed, that claims that are so construed cannot be infringed by Staley's process or the products produced thereby. Consequently, any amendment of the complaint solely to assert other claims of the '647 or '593 patents will be futile.

■ Cultor has not made a colorable argument of possible success in an infringement suit based on other claims of the same patents. Futility of the proposed amendment is an adequate reason to deny leave to amend. *Zahra,* 48 F.3d at 686; *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). Futility was apparent, and is adequate grounds for the denial of leave to amend. The district court did not abuse its discretion in its terse ruling.

*Costs*

No costs.

*AFFIRMED*