**SCHERING CORPORATION and Biogen, Inc., Plaintiffs–Appellants,**

v.

**AMGEN INC., Defendant–Appellee.**

No. 99–1251.

United States Court of Appeals, Federal Circuit.

Aug. 1, 2000.

Gerald Sobel, Kaye, Scholer, Fierman, Hays & Handler, LLP, argued for plain-

tiffs-appellants. With him on the brief were Aaron Stiefel, and Daniel P. DiNapoli. Of counsel on the brief were Michael J. Astrue, Biogen, Inc., of Cambridge, Massachusetts; and James F. Haley, Jr., Fish & Neave, of New York, New York.

Daniel A. Boehnen, McDonnell Boehnen Hulbert & Berghoff, of Chicago, Illinois, argued for defendant-appellee. With him on the brief were John J. McDonnell, and Grantland G. Drutchas. Of counsel on the brief were Steven M. Odre, Stuart L. Watt, Robert R. Cook, Monique Cordray, and Craig Crandall, Amgen Inc., of Thousand Oaks, California. Also of counsel on the brief was D. Dennis Allegretti, Duane, Morris & Heckscher, LLP, of Boston, Massachusetts.

Before RADER, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

RADER, Circuit Judge.

Schering Corporation and Biogen, Inc. (collectively, Schering) sued Amgen Inc. in the United States District Court for the District of Delaware for infringing U.S. Patent No. 4,530,901 (the '901 patent). The '901 patent claims recombinant DNA molecules encoding specific types of human interferon, microorganisms genetically engineered to produce that interferon, and methods of producing interferon with recombinant technology. The district court conducted a pre-trial *Markman* hearing to construe the patent's claims. After the district court announced its claim construction decision, *see Schering Corp. v. Amgen, Inc.*, 18 F.Supp.2d 372 (D.Del. 1998) (*Schering I*), Schering moved for entry of summary judgment of noninfringement in Amgen's favor, explaining that it could not prevail at trial under the district court's interpretation of the claims. The district court granted Schering's motion, and dismissed without prejudice Amgen's motions for summary judgment of patent invalidity and misuse, concluding that those motions are moot in light of the district court's noninfringement judgment. *See Schering Corp. v. Amgen, Inc.*, 35 F.Supp.2d 375, 50 USPQ2d 1051 (D.Del. 1999) (*Schering II*). Schering appeals only the district court's claim construction. Because this court concludes that the district court correctly construed the claims, and because Schering conceded noninfringement under that claim construction, this court affirms the district court's judgment of noninfringement.

I.

Biogen, Inc. is the assignee of the '901 patent; Schering Corp. is Biogen's exclusive licensee under the patent. The '901 patent resulted from the pioneering work of Dr. Charles Weissmann in the fields of immunology and molecular biology in the late 1970s. Dr. Weissmann's work focused on certain human polypeptides, known as interferons. Since the late 1950's, immunologists knew that interferons have important anti-viral and anti-tumor properties. They studied interferons by extracting and purifying blood samples from human subjects. Scientists now appreciate that different cells of the human immune system produce many interferon subtypes. However, at the time of Dr. Weissmann's work, scientists had conclusive evidence of only two varieties: interferon produced by cells known as fibroblasts, and interferon produced by cells known as leukocytes. No one had successfully characterized the specific genes that code for interferon polypeptides, nor had anyone developed a means for producing substantial quantities of interferon. Dr. Weissmann, through a series of elegant experiments, isolated pieces of DNA that code for one of the leukocyte interferon polypeptides, the interferon now referred to in the scientific community as "IFN-α-1."

The '901 patent claims the recombinant DNA molecules containing the structural

**1350**

genes isolated by Dr. Weissmann. As originally filed, the claims referred to leukocyte interferon, instead of IFN-α. The patent also claims genetically engineered micro-organisms containing these recombinant DNA molecules. Finally, the '901 patent claims a method for producing interferon polypeptides by transforming microorganisms with Dr. Weissmann's recombinant DNA molecules, culturing the transformed microorganisms, and then collecting the interferon produced by the cells. Examples of each type of claim, claims 1, 5, and 9, state:

1. A recombinant DNA molecule consisting of segments of DNA from different genomes which have been joined end-to-end outside of living cells and which have the capacity to infect some host and to be maintained therein, and the progeny thereof, comprising a DNA sequence selected from the group consisting of:

    (a) the DNA inserts of Z–pBR322(Pst)/HcIF–2h (DSM 1700), Z–pBR322(Pst)/HcIF–SN35 (DSM 1701), Z–pBR322(Pst)/HcIF–SN42 (DSM 1702) and Z–pKT287(Pst)/HcIF–2h–AH6 (DSM 1703),

    (b) DNA sequences which hybridize to any of the foregoing DNA inserts and which code on expression for a polypeptide of the IFN-¥ type, and

    (c) DNA sequences which code on expression for a polypeptide of the IFN-α type coded for on expression by any of the foregoing DNA sequences and inserts,

    said DNA sequences and inserts being operatively linked to an expression control sequence in said recombinant DNA molecule.

'901 patent, col. 36, ll. 4–23.

5. A unicellular host transformed with at least one recombinant DNA molecule, said molecule, consisting of segments of DNA from different genomes which have been joined end-to-end outside of living cells and which have the capacity to infect some host and to be maintained therein, and the progeny thereof, comprising a DNA sequence selected from the group consisting of:

    (a) the DNA inserts of Z–pBR322(Pst)/HcIF–4c (DMS 1699), Z–pBR322(Pst)/HcIF–2h (DSM 1700), Z–pBR322(Pst)/HcIF–SN35 (DSM 1701), Z–pBR322(Pst)/HcIF–SN42 (DSM 1702) and Z–pKT287(Pst)/HcIF–2h–AH6 (DSM 1703),

    (b) DNA sequences which hybridize to any of the foregoing DNA inserts and which code on expression for a polypeptide of the IFN-¥ type, and

    (c) DNA sequences which code on expression for a polypeptide of the IFN-α type coded for on expression by any of the foregoing DNA sequences and inserts.

*Id.* at col. 36, ll. 39–59

9. A method for producing a polypeptide comprising the steps of preparing a recombinant DNA molecule, consisting of segments of DNA from different genomes which have been joined end-to-end outside of living cells and which have the capacity to infect some host and to be maintained therein, and the progeny thereof, comprising a DNA sequence selected from the group consisting of:

    (a) the DNA inserts of Z–pBR322(Pst)/HcIF–2h (DSM 1700), Z–pBR322(Pst)/HcIF–SN35 (DSM 1701), Z–pBR322(Pst)/HcIF–SN42 (DSM

1702) and Z–pKT287(Pst)/HcIF–2h–AH6 (DSM 1703),

(b) DNA sequences which hybridize to any of the foregoing DNA inserts and which code on expression for a polypeptide of the IFN–¥ type, and

(c) DNA sequences which code on expression for a polypeptide of the IFN-α type coded for on expression by any of the foregoing DNA sequences or inserts,

and having operatively linked thereto an expression control sequence; transforming an appropriate host with said recombinant DNA molecule; culturing said host; and collecting said polypeptide.

*Id.* at col. 37, ll. 18–40. Even a cursory review of the claims reveals that they recite the specific recombinant DNA inserts isolated by Dr. Weissmann, and their use. Many years later, scientists sequenced Dr. Weissmann's DNA inserts and discovered that they code for a subtype of leukocyte interferon known as IFN-α-1.

Schering sued Amgen, alleging that Amgen's consensus interferon product infringes the '901 patent. Amgen's product is a synthetic polypeptide that does not correspond to any naturally occurring interferon subtype. Instead, Amgen reviewed the amino acid sequence of each known IFN-α subtype (interferon, like all peptides, is a string of amino acids, each of which is coded for by one of several DNA sequences). Based on this review, Amgen produced a recombinant DNA sequence that codes for an amino acid sequence that is a consensus, or average, of the sequences found in the natural IFN-α subtypes. Thus, Amgen produces an amino acid sequence, which at each position contains an amino acid present in one or more known IFN-α subtype, but does not duplicate the amino acid sequence of any single IFN-α subtype.

## II.

This court reviews the district court's grant of Schering's summary judgment motion without deference, applying the same standard as the trial court. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064, 46 USPQ2d 1097, 1103 (Fed.Cir.1998). In applying a *de novo* standard, this court examines the record in the light most favorable to the non-movant, Amgen. *See id.*

Following its pre-trial *Markman* hearing, the district court construed the claims of the '901 patent. Schering contends that the district court erred in its interpretation of the term "polypeptide of the IFN-α type." This court reviews the central question of claim interpretation without deference. *See Key Pharm. v. Hercon Lab. Corp.*, 161 F.3d 709, 713, 48 USPQ2d 1911, 1914 (Fed.Cir.1998). Therefore, notwithstanding the district court's exhaustive and well-reasoned fifty-five page opinion, this court undertakes an independent examination of the claim limitations.

The district court limited the '901 patent claims to DNA sequences for the naturally occurring IFN-α-1 subtype, instead of construing the claims to cover sequences that code generally for all IFN-α polypeptides. The district court also concluded that the claim language covers only sequences for an immature interferon polypeptide. An immature polypeptide includes extraneous sequences such as leader and/or targeting sequences that normal human cells cleave away before secreting the polypeptide.

### A.

This court first addresses whether the term "IFN-α" encompasses all IFN-α subtypes. The district court concluded that the IFN-α terminology was new matter added to Dr. Weissmann's patent application in violation of 35 U.S.C. § 132 (1994).

Thus, the district court did not consider the references to IFN-α when construing the claims. *See Schering I*, 18 F.Supp.2d at 389.

■■ Section 132 of the Patent Act provides: "[N]o amendment shall introduce new matter into the disclosure of the invention." 35 U.S.C. § 132. The fundamental inquiry is whether the material added by amendment was inherently contained in the original application. *See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438, 221 USPQ 97, 106 (Fed.Cir. 1984). To make this judgment, this court has explained that the new matter prohibition is closely related to the adequate disclosure requirements of 35 U.S.C. § 112. *See Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1578, 222 USPQ 833, 836 (Fed. Cir.1984). Section 112, in turn, requires: "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms *as to enable* any person skilled in the art ... to make and use the same." 35 U.S.C. § 112 (1994) (emphasis added). Thus, to avoid the new matter prohibition, an applicant must show that its original application supports the amended matter. *See Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1539, 41 USPQ2d 1829, 1832 (Fed.Cir.1997).

■ When originally filed, the application that issued as the '901 patent ('901 application) referred to leukocyte interferon, not IFN-α. About six months after the filing of the patent application, however, a committee of scientists adopted new terminology to describe interferons. *See Interferon Nomenclature*, 286 Nature 110 (July 10, 1980). Because scientific experiments showed that the old terminology did not accurately differentiate between species of interferon, that committee abolished the term "leukocyte interferon" in favor of the term "IFN-α." The term "leukocyte interferon" indicated the source of the interferon—leukocytes. The term "IFN-α" more specifically identified a particular polypeptide by its physical properties—molecular weight, binding affinity for highly specific antibodies, and amino acid sequence. The committee determined that leukocytes in fact produce other types of interferon beyond "leukocyte interferon," thus necessitating the nomenclature change. *See id.*

Because of the terminology change in the art, Dr. Weissmann amended the claims of his '901 application to substitute "IFN-α" for "leukocyte interferon." Dr. Weissmann also amended the written description to explain: "[i]n this application the interferon nomenclature announced in *Nature*, 286, p. 110 (July 10, 1980) is used. E.g., leukocyte interferon is designated IFN-α." '901 patent, col. 1, ll. 21–23.

The district court determined that this substitution of the term "IFN-α" in the '901 application did not merely replace the outdated term "leukocyte interferon." Rather, according to the trial court, the substitution imported years of scientific advance into the '901 patent's disclosure and claims. Following this reasoning, the district court found that the change in terminology actually advanced the patent's definition of interferons to include numerous polypeptides not discovered at the time of the patent application. Thus, the district court concluded that the terminology substitution violated the new matter prohibition.

This court does not discern a new matter violation in the substitution of the term "IFN-α" for "leukocyte interferon". This court interprets the claim term "IFN-α" in light of the patent's written description. The written description clarifies that Dr. Weissmann made no attempt to broaden his invention to cover polypeptides not discovered at the time of his patent application. Rather, Dr. Weissman stated no more than: "leukocyte interferon is desig-

nated IFN-α." In other words, Dr. Weissman's amendment explained that the leukocyte interferon he had isolated and produced now has a new scientific name. Indeed the scientific community had designated Dr. Weissman's interferon as IFN-¥. The written description accompanying his new claim language specifies that the amendment merely renames his invention—whatever its scope may have been at the time of application—in accordance with accepted scientific norms. The amendment merely substitutes terminology.

This reasoning refocuses the question before this court on the scope of the claim term "polypeptide of the IFN-α type" at the time of application. As already noted, this court interprets the claim at issue to cover no more than what the specification supported at the time of filing. Thus, this court undertakes to discern the scope of the claim term IFN-α at the time of Dr. Weissman's application.

■■■■ "The claim language, of course, defines the bounds of claim scope." *York Prod., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996). "Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning." *Id.* In this case, as explained above, the patentee expressly limited the meaning of the term "IFN-α" to define the leukocyte interferon Dr. Weissmann described in his original application.

The scientific meaning of "IFN-α" evolved with new discoveries. Specifically, the scientific community learned that leukocytes produce more than a single interferon polypeptide. The term as used in the '901 patent, however, did not and could not enlarge the scope of the patent to embrace technology arising after its filing. Rather the term "IFN-α" in the patent has a specialized meaning limited to the partic-

ular leukocyte interferon that Dr. Weissmann supported in his original application. In sum, this court must determine what the term meant at the time the patentee filed the '901 application. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1555, 42 USPQ2d 1737, 1742 (Fed.Cir.1997) (abrogated by the en banc court on other grounds in *Cybor v. FAS Technologies, Inc.,* 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir. 1998)) ("As a general rule, the construing court interprets words in a claim as one of skill in the art at the time of invention would understand them.").

In February of 1980, when Dr. Weissmann filed the '901 application, leukocyte interferon (and its later substitute, the term "IFN-α" in its limited application) defined what scientists thought was a specific single polypeptide. At the time of invention, the record shows that scientists in this field interpreted Dr. Weissmann's pioneering work to have produced a specific polypeptide produced by leukocytes, hence the term "leukocyte interferon." At that time, the record shows, the scientific community and Dr. Weissmann understood that this interferon was the sole interferon polypeptide produced by leukocytes. Therefore, those skilled in the art used the term "leukocyte interferon" to denote an interferon polypeptide that originates from leukocytes.

Only later did scientists learn that interferon has many subtypes. The *Nature* article, published more than five months after the '901 application filing, acknowledged the possibility of different IFN-α subtypes stating: "subtypes of IFNs based on specific amino acid sequence differences can be classified as Hu IFN-$\alpha_1$, Hu IFN-$\beta_2$, etc." Because, at the time of the '901 application, neither Dr. Weissmann nor others skilled in the art knew of the existence of, let alone the identity of, the specific polypeptides now identified as subtypes of IFN-α, those subtypes cannot

be within the scope of the claims. The district court correctly concluded:

> After perusing the specification of the '901 Patent, the Court found the specification did not differentiate between different subtypes of leukocyte interferon. It followed from this conclusion that only one subspecies of alpha interferon was described and enabled in the specification.

*Schering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 297, 50 USPQ2d 1125, 1128 (D.Del.1998) (*Schering III* ).

More to the point, because the specific identity of the polypeptide coded for by the DNA isolated by Dr. Weissmann was unknown (either by the polypeptide's amino acid sequence or the DNA sequence of Dr. Weissmann's inserts), the district court correctly limited the claim scope to cover only polypeptides coded for by the inserts deposited by Dr. Weissmann. Thus, because the record shows that when sequenced, the inserts were discovered to code for IFN-α-1, that is the only interferon subtype that Dr. Weissmann's patents describe and embrace. To grant broader coverage would reward Dr. Weissmann for inventions he did not make. Therefore, although this court disagrees with the rationale by which the district court reached its decision regarding the IFN-α subtypes, this court agrees with the district court's conclusion that the claims cover only IFN-¥-1 polypeptides.

### B.

Another issue affects the claim interpretation question. After the district court construed the claims, Schering for the first time proffered evidence that one of Dr. Weissmann's original deposits codes for IFN-α-14—another interferon subtype. After possessing Dr. Weissmann's deposits for nearly 18 years, Schering nonetheless pled that recent tests had discerned that insert 4c (one of the samples deposited at the time of Dr. Weissmann's original application) codes for IFN-α-14. The district court denied Schering's motion to reopen the record and reinterpret the claims to account for the recent test results:

> Given the availability to Schering of the 4c insert DNA for over 18 years, the fact that its researcher, Greenberg, determined the DNA sequence of the 4c insert at some unknown time, but in any event before June 9, 1998, and the fact that the necessary computer work to reveal the "newly discovered evidence" could have been done in two days all leads to the conclusion that the "newly discovered evidence" could have been easily discovered prior to the *Markman* hearing. Under these facts, it is impossible to conclude that Schering exercised due diligence to discover that the 4c insert DNA allegedly codes on IFN-α-14.

*Schering III,* 25 F.Supp.2d at 299–300.

■ On appeal, Schering asks this court to interpret the claims to accommodate its recent information. This court interprets a claim without deference to the district court's interpretive efforts, solely on the basis of the record on review. *See Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 144, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This appellate court does not possess authority to both make and review a record. The sequence evidence Schering asks this court to consider is not part of the record on appeal. The district court expressly excluded that evidence as untimely in its denial of Schering's motion for reargument. *See Schering III,* 25 F.Supp.2d at 300.

■ This court reviews the district court's decision to exclude that evidence according to the evidentiary standards set by our sister circuit, the United States Court of Appeals for the Third Circuit. *See Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359, 50

USPQ2d 1672, 1675 (Fed.Cir.1999) (en banc in relevant part). The Third Circuit will only reverse in this situation if the trial court abused its discretion. *See Murray v. Commercial Union Ins. Co.,* 782 F.2d 432, 435 (3rd Cir.1986). As the district court explained, Schering held Dr. Weissmann's DNA inserts in its possession for over eighteen years, before choosing to sequence the inserts. Schering then sought to use the sequence information obtained, even though Schering proffered that information only after the district court closed its proceedings to interpret the claims. This court discerns no abuse of discretion in the district court's exclusion of the 4c insert sequence data because Schering did not exercise due diligence in obtaining that data.

▇▇▇ Schering further argues that, even though it did not timely analyze Dr. Weissmann's DNA inserts, the inserts were part of the public record by virtue of their public deposit. This court has held that, "[s]uch a deposit has been considered adequate to satisfy the *enablement* requirement of 35 U.S.C. § 112." *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1210, 18 USPQ2d 1016, 1024 (Fed.Cir.1991). Indeed, if the evidence Schering now proffers at the appellate stage had been part of the record at trial, it might indeed support a claim construction that includes IFN-α-14. However, it is not part of the record either before the trial court or this court. Although a deposit may suffice for enablement purposes, it must be part of the record before it can provide evidence to support a particular claim construction. The party proffering evidence to the trial court must offer and explain that evidence in terms accessible to the court. A court has no scientific resources or expertise to derive a DNA sequence from a raw deposit and apply its legal reasoning to that result. Schering had the burden, which it did not meet, to supply evidence of the content and meaning of the deposit to the trial court in a timely fashion. Therefore, this court sustains the district court's ruling on the evidentiary value of Schering's proffer. Without Schering performing the appropriate sequencing analysis and presenting evidence to the district court under the applicable Federal Rules of Civil Procedure and Evidence, the deposit of the 4c insert is not before this court or the district court and cannot influence the scope of the '901 patent claims.

## C.

Next, Schering argues that the claims of the '901 patent should be construed to cover the mature IFN-α polypeptide. Natural DNA sequences for human interferon (and many other proteins) include extra genetic code that, when translated into a nascent polypeptide, is used for locational targeting within the cell and perhaps for other purposes. In nature, post-translational processes inside the cell remove those sequences to create a mature protein. Scientists in the genetic engineering art often attempt to identify the DNA sequences coding for such extra parts of the polypeptide. They can then remove the genetic code for those extraneous sequences, thus producing a mature polypeptide that needs no further processing.

When Dr. Weissmann isolated the interferon DNA sequences that he claimed as the inserts in the '901 patent, he had not identified the extraneous sequences, nor the need to remove them. The record indicates that Dr. Weissmann's inserts cited in the claims of the '901 patent also contain the extraneous sequence that, when expressed, produce an immature polypeptide. For the same reasons as discussed above relating to IFN-α subtypes, this court concludes that the district court correctly construed the claims as covering only immature polypeptides. This court need not reach the question of whether

one of skill in the art at the time of infringement would know to remove the extraneous sequence and thus would infringe under the doctrine of equivalents.

### III.

Because this court finds that the district court correctly construed the claims of the '901 patent to embrace only the immature form of the polypeptide now known in the art as IFN-α-1, this court affirms the district court's grant of Schering's motion for summary judgment in Amgen's favor.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*